**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

LUCIA RAMOS-QUIRARTE,

Plaintiff,

v.

BETTY T. OMANDAC, *et. al.*,

Defendants.

Case No. 2:23-cv-01778-RFB-NJK

**ORDER**

## I.    INTRODUCTION

Before the Court is Defendants State of Nevada *ex rel.* Nevada Department of Corrections ("NDOC"), State of Nevada *ex rel.* Nevada Department of Conservation and Natural Resources, Division of Forestry, Betty T. Omandac, Monique K. Liefert, Amanda J. Hopkins, Christopher W. Nehls, and Shelly Ann Weigert (collectively, "Defendants")'s motion to dismiss the Complaint (ECF No. 4), Defendants' two motions for leave to file document (ECF Nos. 27, 45), and Defendants' motion to stay discovery (ECF No. 42). For the reasons stated below, the Court denies the motions for leave to file document, denies the motion to dismiss without prejudice, and grants the motion to stay *nunc pro tunc*.

## II.    PROCEDURAL BACKGROUND

Plaintiff commenced this case by filing a Complaint on September 5, 2023, in the Eighth Judicial District Court for Clark County, Nevada. ECF No. 1-1. Plaintiff alleges that she injured her shoulder while incarcerated at Florence McClure Women's Correctional Center and asserts two constitutional deliberate indifference claims under the Nevada Constitution and 42 U.S.C. § 1983. Defendants removed this case to the United States District Court for the District of Nevada on November 1, 2023. ECF No. 1. Defendants filed a motion to dismiss the Complaint on

November 8, 2023. ECF No. 4. The motion to dismiss was fully briefed by November 29, 2023. ECF Nos. 8, 13. On May 20, 2024, Defendants filed a motion for leave to file. ECF No. 27. It was fully briefed by June 10, 2024. ECF No. 28, 31. The Court held a hearing on the instant motions on June 17, 2024. ECF No. 32. On November 15, 2024, Defendants filed a motion to stay discovery, (ECF No. 42), which was briefed by December 3. ECF Nos. 43, 44. Defendants filed an additional motion for leave to file on December 19, 2024. ECF Nos. 45, 46. Plaintiff responded. ECF No. 47. On March 26, the parties filed a joint motion for settlement conference. ECF No. 48. This Order follows.

### III.    FACTUAL ALLEGATIONS

#### A.  Injury

Plaintiff Lucia Ramos-Quirarte was incarcerated at Florence McClure Women's Correction Center ("FMWCC"), a prison facility staffed and operated by the State of Nevada through NDOC. Plaintiff was assigned to the top bunk of her cell. On May 10, 2021, Plaintiff began to fall as she was exiting the top bunk. This required her to grab the bunk steps with her left hand, which caused her left shoulder to twist, hit the metal bunk, and land sharply on her left side, causing immediate pain and injury to her left shoulder.

Eleven days later, on May 21, 2021, Plaintiff was seen by Defendant Omandac as part of her medical intake at FMWCC. Plaintiff notified Omandac of her injury. She told Omandac that she could not lift her left arm and remained in continuing and substantial left shoulder pain as a result of the fall. Omandac opined that Plaintiff had pulled a muscle and told Plaintiff that she would be assigned to a bottom bunk until her shoulder healed. That same day Omandac executed a Health Classification and Restriction form for Plaintiff, designating Plaintiff as "[n]ot fit for NDF fire suppression crew" and "[l]ower bunk only." The form also noted that Plaintiff's housing assignment needed to be "limited to institutions or facilities with or near health care capacity to treat limiting conditions."

#### B.  Initial Requests for Medical Treatment Go Ignored

Plaintiff's pain and immobility persisted. Thus, on or around May 28-29, 2021, Plaintiff submitted a medical kite requesting assistance because she still could not lift her left arm and

1   remained in continuing and substantial left shoulder pain. In response, Omandac told Plaintiff that

2   sick calls were only for emergencies, that she would be put on a waiting list to see a doctor, and

3   that further medical kites, absent an emergency, would result in a major charge.

4           On July 27, 2021, Plaintiff submitted a follow-up medical kite, noting: "I kited on 5-29-21

5   and I got a response saying to 'wait for Appt.' Then I was told I have a 'restriction.' What does

6   that mean? I never got called for an Appt. I check every day!" An unidentified NDOC employee

7   responded to the kite, indicating that "as of 5/21/21 you have no restrictions."

8           Plaintiff followed up again on August 1, 2021. She submitted a Request for Reversal of

9   Medical Charges, stating: "The nurse said I could 'not' see the Doctor until I got X rays done. She

10  send me back to my cell." An unidentified NDOC Medical Administrator responded to the request,

11  indicating "No - Reclass." On August 28, 2021, Plaintiff followed up a third time. She submitted

12  a medical kite stating: "I need an Appt. I been waiting on one since 5-21-21." The kite was received

13  and signed by an unidentified NDOC employee, but Plaintiff received no response. On August 28,

14  2021, Plaintiff submitted a fourth medical kite regarding her shoulder. In that kite she writes: "I

15  been trying to get an App since 5-21-21 and had 'not' gotten one yet. Your Medical Team has

16  made an 'error' and has put the wrong info in my Medical Record. Thanks to this Medical 'error,'

17  I have not been able to go to JCC [referencing the Jean Conservation Camp]. Can you please get

18  me an App ASAP so that I can clarify this issue. Is not right or fare that I been held back from JCC

19  for over 3 month's due to a Medical Error." The kite was received by Defendant Liefert, but there

20  was no response by NDOC.

21          On August 30, 2021, Plaintiff was transferred to a work unit at FMWCC. Upon her transfer,

22  Plaintiff informed Defendant Hopkins of her injury and pain, noting that she could not lift her left

23  arm, that she had difficulties with dressing and undressing due to the continuing pain, and that she

24  was still waiting for a doctor's appointment with NDOC Medical. Plaintiff remained in the work

25  unit until on or about October 5, 2021. Plaintiff never received her appointment with NDOC.

26                      **C. Transfer from FMWCC to JCC and Aggravation of Injury**

27          On October 5, 2021, Plaintiff was transferred from FMWCC to the JCC. During her intake

28  medical exam at JCC, Plaintiff spoke with Defendant Nehls. She described to Nehls the continuing,

painful, and entirely unresolved injury to her left shoulder. Despite this, Nehls wrote down that there were no findings for continuing care and no follow up was required. Nehls did indicate that he would order "Icy-Hot" for her shoulder strain and Physician's Orders dated October 19, 2021, noted "Tylenol 32mg / Ace Wrap / and Icy hot."

Despite this, on November 4, Plaintiff was ordered to participate in the "pack test" which required her to run or walk three miles with a 45-pound pack. Immediately after the 45-pound pack was put on her shoulders, Plaintiff felt an increased and intense pain in her left shoulder. On her sixth lap, the sharp pain spread from her shoulder through her neck, causing an extreme headache. By the eighth lap, Plaintiff was in such pain that she felt like she was going to faint, and she informed an unidentified NFF employee that she had to stop the pack test. The unidentified NFF employee informed Plaintiff that Defendant Nehls would follow up with her about the exacerbated injury.

Four days passed and Plaintiff did not receive any follow up from Defendant Nehls. On November 8, 2021, Plaintiff was moved from JCC cell #32E to JCC #2, where she was initially assigned a top bunk. Following Plaintiff's objection that she needed a bottom bunk due to the swelling and inflammation of her shoulder, an unidentified NFF employee again informed Plaintiff that Defendant Nehls would follow up with her about the exacerbated left shoulder injury.

That same day, Plaintiff submitted a medical kite, asking "Can I please see medical attention as soon as possible?" This plea was accompanied by the notation: "My shoulder got re-hurt with the Pack test and my arm got swollen all the way to my wrist. Now they moved me to a top bunk and I can't get up to the top bunk without hurting my arm." Defendant Nehls finally saw Plaintiff that day, and Nehls, along with the supervising Lieutenant, proceeded to initiate a transfer from JCC back to FMWCC to evaluate Plaintiff's left shoulder. Plaintiff arrived at the FMWCC infirmary, where she was treated by Defendant Weigert and Omandac, and received a follow up the next morning.

The Progress Notes from the follow up on November 9, 2021, note that Plaintiff had shoulder pain and swelling after the pack test and that Plaintiff had a history of shoulder pain beginning with her fall from the top bunk five months earlier. The notes also stated that Plaintiff

1  was unable to lift her arm forward more than 90 degrees, to the side more than 45 degrees, and

2  unable to reach her back. That same day, Defendant Omandac ordered an x-ray to be taken for her

3  left shoulder.

4        **D.  Plaintiff Never Receives X-Ray Results or Further Treatment Despite**

5            **Additional Requests**

6        Plaintiff's pain and swelling continued. A little over a month later, on December 15, 2021,

7  Plaintiff submitted a medical kite to Defendant Weigert: "I was brought back from JCC on 11-8-

8  21 due to my shoulder. The Doctor [referencing Defendant Omandac] said she was going to submit

9  for an approval for X rays. I have gotten called. My shoulder still hurts a lot and my arm is still a

10 little swollen. Have they approved my X ray?" The only response Plaintiff received was a form

11 stamp which stated, "[Y]ou're on doctor's sick call list wait for appt." About a week later, on

12 December 21, 2021, Plaintiff received a call to see the doctor, but an unidentified NDOC

13 Correctional Nurse told her that she could not see the doctor until x-rays were taken of her

14 shoulder.

15       On December 28, 2021, Plaintiff submitted a second medical kite to Defendant Weigert,

16 again inquiring about the pending x-rays and informing Weigert that she was still in intense pain.

17 Weigert never responded to the kite.

18       Plaintiff submitted a third medical kite to Defendant Weigert on January 9, 2022, stating,

19 "I kitted you on 12-15-21 about my shoulder hurting and my left harm [arm] still swollen, you put

20 me on to see the Doctor on 12-21-21. The Nurse that saw me 'did not' let me see the Doctor, she

21 said I needed to have my X ray done first. Am I on the list for X rays? I was brought back from

22 JCC on 11-9-21 on Medical, due to my shoulder. It still hurts and my whole arm still swelled up."

23 Weigert responded, "We do have an x-ray ordered for you. With facility lockdown you will have

24 your x-ray with our next group." By January 19, 2022, the x-rays still had not been confirmed or

25 performed. Weigert informed Plaintiff she would look into the pending x-rays.

26       Plaintiff was again transferred to a working unit on February 22, 2022. On February 25,

27 Plaintiff was called to see an unidentified NDOC caseworker to sign a work release form. Plaintiff

28 informed the caseworker that she was still experiencing pain in her shoulder, that she could not

1  lift, push, or otherwise work with her left arm, and that she was still awaiting x-rays. The NDOC

2  caseworker still required Plaintiff to sign the work release and instructed her to keep an eye on the

3  workers list.

4       On March 6, 2022, about ten months after the initial injury and four months after the pack

5  test, Plaintiff finally received x-rays on her left shoulder and was informed that the doctor would

6  call her with the result of the x-ray. On March 14, 2022, an unidentified shift commander called

7  Plaintiff about a potential work assignment. During the call, Plaintiff inquired about the status of

8  her x-ray results and complained of her injury. The shift commander said "okay" and hung up.

9       On March 28, 2022, Plaintiff was released from prison without receiving the results of her

10  x-rays, any follow-up with a doctor about those x-rays, a diagnosis, or further treatment. After her

11  release, Plaintiff sought medical treatment for her injured shoulder, where it was revealed that she

12  had a tear in her rotator cuff that necessitated surgery.

13  **IV.    LEGAL STANDARD**

14       An initial pleading must contain "a short and plain statement of the claim showing that the

15  pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure

16  to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In ruling on a motion

17  to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and

18  are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Servs.,

19  Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

20       To survive a motion to dismiss, a complaint need not contain "detailed factual allegations,"

21  but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements

22  of a cause of action . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

23  Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains

24  "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

25  meaning that the court can reasonably infer "that the defendant is liable for the misconduct

26  alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on

27  the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive

28  dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences

1   from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S.

2   Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).

3   **V.   DISCUSSION**

4       The Court now turns to the merits of the motions. Defendants move to dismiss Plaintiff's

5   complaint in its entirety. Defendants assert four arguments. First, they argue that Plaintiff's Nevada

6   constitutional claim is one for medical malpractice. It is thus barred (1) because of the one-year

7   statute of limitations under NRS 41A.097(2) and (2) because Plaintiff failed to file a supporting

8   affidavit as required by NRS 41A.071. Next, Defendants argue that Plaintiff's Nevada

9   constitutional claim fails because there is no private right of action for damages for deliberate

10  indifference to a serious medical need under Article I, Section 6 of the Nevada Constitution. Next,

11  Defendants argue that, even if the Court recognized such an action, Plaintiff's Complaint should

12  still be dismissed because she fails to allege deliberate indifference under either the federal or

13  Nevada Constitution. Finally, Defendants assert that they are entitled to qualified immunity. The

14  Court addresses each argument in turn, before turning to the motion to stay and motions for leave

15  to file.

16  **A. Statutory Requirement under NRS 41A.097**

17      First, Defendants argue that Plaintiff's state constitutional claim is one for professional

18  negligence or medical malpractice, rather than one for deliberate indifference to a serious medical

19  need, and should therefore be dismissed because of (1) the one-year statute of limitations and (2)

20  the failure to attach an affidavit as required by NRS 41A.071. The Court disagrees.

21      Defendants' argument fails to recognize that Plaintiff brings a claim against Hopkins, who

22  is a correctional officer and not a medical provider, and thus an action for professional negligence

23  does not apply here. Moreover, Defendants conceded at oral argument that Plaintiff could

24  potentially pursue claims for negligence, gross negligence, or intentional infliction of emotional

25  distress against the non-medical correctional officers, rather than a professional negligence or

26  malpractice claim. The Court therefore rejects this argument as to Hopkins.

27      With respect to Omandac, Weigert, and Nehls, the Court finds that the determination of

28  whether Plaintiff must sue the remaining medical provider defendants under NRS 41A.097 turns

on whether there is a private damages action for a claim of deliberate indifference to a serious medical need under the Nevada Constitution. For the reasons stated below, the Court finds that there is. Therefore, Plaintiff's claim will not be construed as a medical malpractice claim under NRS 41A.097. It also follows that Defendants' remaining statutory arguments fail because neither the one-year statute of limitations nor the affidavit requirement apply to Plaintiff's claim for deliberate indifference under the Nevada constitution.[1] Instead, the Court finds, and Defendants do not dispute, that Plaintiff's Nevada constitutional claim would be timely under either the two-year personal injury limitations period that applies to tort claims brought under § 1983, or the four-year catch-all limitations period under NRS 11.220. Therefore, Defendants' motion to dismiss on these grounds is denied.

### B.  Private Right of Action Under Nevada Constitution

Next, Defendants assert that if Plaintiff is pursuing a constitutional claim, instead of one for professional negligence or malpractice, then there is no private right of action under the Nevada Constitution and the claim must be dismissed. The Court disagrees.

As a threshold matter, the Court finds that there is no controlling Nevada precedent on whether a private damages action exists for a claim of deliberate indifference to a serious medical need under Article I, Section 6 of the Nevada Constitution. The Court further finds that the use of certification rests in the sound discretion of the federal court. See Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974) ("[Certification's] use in a given case rests in the sound discretion of the federal court."); In re McLinn, 744 F.2d 677, 681 (9th Cir. 1984) (certification is discretionary and should be limited to compelling situations). "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).

The Court finds, by applying the framework established by the Nevada Supreme Court in

---

[1] Indeed, the Court is foreclosed from applying the statute of limitations period for medical malpractice to a claim under the Nevada constitution. See Nev. Rev. Stat. Ann. § 11.220 ("An action for relief, not hereinbefore provided for, must be commenced within 4 years after the cause of action shall have accrued, regardless of whether the underlying cause of action is analogous to that of any other cause of action with a statute of limitations expressly prescribed by law."); see also U.S. Bank, N.A. v. Thunder Properties, Inc., 503 P.3d 299, 304 n.3 (Nev. 2022) (noting that the NRS 11.220 amendment superseded the doctrine of analogous limitations for any claim filed after May 27, 2021); Martel v. HG Staffing, LLC, 519 P.3d 25, 29 (Nev. 2022) (same).

1    <u>Mack v. Williams</u>, that Plaintiff has brought a cognizable claim under the Nevada Constitution.

2    522 P.3d 434 (Nev. 2022); <u>see also</u> <u>Vandecar v. Daniels</u>, No. 2:20-CV-02150-ART-BNW, 2024

3    WL 4349430, at *4 (D. Nev. Sept. 30, 2024) (denying a motion to dismiss plaintiff's claims for

4    damages under Article 1, §§ 6, 8, and 9 of the Nevada Constitution, noting that "<u>Mack</u> provides

5    the framework for establishing whether a provision of the Nevada Constitution contains a right of

6    action and whether that right of action permits damages actions"); <u>Cardenas-Ornelas v. Wickham</u>,

7    No. 2:21-CV-00030-ART-VCF, 2024 WL 4368152, at *5 (D. Nev. Sept. 30, 2024) (allowing

8    plaintiff's claim under Article 1, Section 6 of the Nevada Constitution to proceed because the <u>Mack</u>

9    "factors favor recognizing an implied right of action for damages").

10                                   *i.*        ***Legal Standard***

11           In <u>Mack v. Williams</u>, the Nevada Supreme Court held that Article 1, Section 18 of the

12   Nevada Constitution contained an implied right of action for damages. 522 P.3d at 441. The court

13   first reasoned that under longstanding Nevada constitutional law, provisions like Article 1, Section

14   18 that prohibit the government from violating rights are "self-executing": they implicitly contain

15   a cause of action, whether or not the legislature created one. <u>Id.</u> at 442. Recognizing that a

16   "damages remedy does not automatically follow from the conclusion that a private right of action

17   exists," the court formally adopted a three-part framework from California Supreme Court case

18   <u>Katzberg v. Regents of Univ. of California</u>, 58 P.3d 339, 342-43 (2002), to "approach, on a case-

19   by-case basis, whether to recognize a damages action for violations of an at-issue self-executing

20   constitutional provision." <u>Id.</u> at 442. At step one, a court considers whether the language or history

21   of the constitutional provision at issue evinces an intent to authorize or withhold damages. <u>Id.</u>

22   Absent clear indication of intent, a court moves on to step two, a "constitutional tort analysis,"

23   which favors implying a constitutional remedy when doing so is "consistent with the purpose of

24   and necessary to enforce the provision[.]" <u>Id.</u> at 445, 448. Finally, at step three, a court considers

25   whether "special factors counsel[] hesitation." <u>Id.</u> at 445.

26                                   *ii.*       ***Discussion***

27           First, the Court finds that Article 1, Section 6 is a self-executing provision. Article 1,

28   Section 6 of the Nevada Constitution mirrors the Cruel and Unusual Punishment Clause of the

Eight Amendment to the United States Constitution. It states: "Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishments be inflicted, nor shall witnesses be unreasonably detained." Nev. Const. art. I, § 6. Similarly to Article 1, Section 18, this provision "prohibit[s] certain conduct" by the government and imposes "a limitation" on government conduct, specifically by prohibiting excessive bail, excessive fines, cruel or unusual punishment, and the unreasonable detention of witnesses. See Mack, 522 P.3d at 442 (quoting Jensen v. Cunningham, 250 P.3d 465, 481-82 (Utah 2011)). Under Nevada Supreme Court precedent, such "prohibitory provisions" are "self-executing." See id.; Wilson v. Koontz, 348 P.2d 231, 232, 233-34 (1960); Wren v. Dixon, 161 P.2d 722, 729 (1916); Alper v. Clark Cnty., 571 P.2d 810, 811 (1977). It thus follows from these decisions that this self-executing provision "contains a private cause of action . . . regardless of any affirmative legislative authorization." See Mack, 522 P.3d at 444 (finding that "self-executing rights require no specific language or procedure for their private enforcement").

Next, the Court applies the three-part framework of Katzberg to assess the availability of money damages for violations of this self-executing provision. Id. First, the Nevada Supreme Court treats "the plain language of the Constitution as controlling to the extent the language therein expresses an intention to grant or to withhold a private right of action" for damages. Id. at 444. Here, the language of Article 1, Section 6 neither authorizes nor prohibits money damages. As with Mack, the Court does not find that the "absence of language in the Nevada Constitution regarding a private damages action to enforce [Article 1, Section 6] as a limitation on the judiciary's inherent powers to recognize such an action." Id. Thus, "although the Nevada Constitution does not address enforcement of [this] individual right[], it also does not foreclose an implied right of action for money damages based on violations of [this] right[]." Id. Finding no affirmative indication of intent, the Court turns to the second part of this test.

The second part of the test, requiring a "constitutional tort analysis," relies on § 874 A of the Restatement (Second) of Torts. Id. at 445. Section 874A of the Restatement indicates that "a remedy should exist for violations of a prohibitory constitutional provision if such a remedy is (1) in furtherance of the purpose of the provision and (2) is needed to assure the effectiveness of the

provision." Id. at 447 (citing Restatement (Second) of Torts § 874A (1979)). The Restatement also lists several factors to consider in applying that analysis: (1) "[t]he nature of the legislative provision," (2) "[t]he adequacy of existing remedies," (3) the extent to which a tort action "supplement[s] or interfere[s] with" existing remedies and enforcement, (4) "[t]he significance of the purpose" of the provision, (5) "[t]he extent of the change in tort law," and (6) "[t]he burden" on the judiciary. Id. at 448 (citing Restatement (Second) of Torts § 874A cmt. h. (1979)).

These factors favor recognizing an implied right of action for damages. As the United States Supreme Court has noted, the "primary concern of the drafters [of the prohibition against cruel and unusual punishment] was to proscribe 'tortures,'" Estelle v. Gamble, 429 U.S. 97, 102 (1976), and the claim for deliberate indifference arose out of the recognition that a failure to treat incarcerated people "may actually produce physical 'torture'" and thus constituted the "unnecessary and wanton infliction of pain," which the framers intended to proscribe through the passage of the Eighth Amendment. Id. As Nevada's Constitution has a nearly identical prohibition, it is reasonable to infer that such concerns were likewise the origin for its adoption. Thus, the nature of the provision of Article 1, Section 6 is "both important and fundamental." Katzberg, 58 P.3d at 357 (2002); Mack, 522 P.3d at 449 ("The nature of the constitutional provision protects a fundamental right and is specific regarding the type of conduct which is prohibited."); Cardenas-Ornelas, 2024 WL 4368152, at *5 ("Section 6 is, like Section 18, a significant Constitutional right."). Recognizing a private action for damages would further the purpose of this provision.

Recognizing a private action for damages is also needed to assure the effectiveness of the provision. As the Nevada Supreme Court concluded in Mack, this Court is not persuaded that other state law tort claims, such as negligence, would be an adequate alternative remedy for violations of Nevada's cruel and unusual punishment prohibition. Id. at 448 ("[W]e reject the NDOC parties' assertion that state tort law provides meaningful redress for invasions of the constitutional right at issue here."); see also Cardenas-Ornelas, 2024 WL 4368152, at *5 (finding that existing alternative remedies to Article 1, Section 6 "like state tort law serve 'different interests' than constitutional guarantees").

As Mack noted, the Constitution imposes higher standards than state tort law and it is

inappropriate to apply a lower standard to alleged constitutional violations. See Mack, 522 P.3d at 448 ("A state actor's legal obligation under a state constitution 'extends far beyond that of his or her fellow citizens' under tort law[.]"); Cardenas-Ornelas, 2024 WL 4368152, at *5 ("Tort law establishes generally duties between members of the community, while constitutional remedies provide higher standards[.]"). This higher standard recognizes that state tort law and constitutional law serve vitally different roles. For example, state tort law is designed to regulate relationships among private individuals, whereas constitutional provisions impose obligations on state actors to protect and defend individual rights. See, e.g., Dorwart v. Caraway, 58 P.3d 128, 137 (Mont. 2002) (agreeing with "authorities that there is a great distinction between wrongs committed by one private individual against another and wrongs committed under authority of the state"); Binette v. Sabo, 710 A.2d 688, 699 (Conn. 1998) (noting "important distinction between the tortious misconduct of one private citizen toward another, on the one hand, and the violation of a citizen's constitutional rights by a police officer, on the other"). An implied right of action for damages ensures that a defendant's alleged violation is assessed by the higher standards required to protect and enforce the rights enshrined in the state constitution.

Additionally, state tort claims, such as negligence, evolved from the common law whereas a claim for deliberate indifference arises from the Nevada Constitution. These different legal bases provide distinct frameworks for establishing claims. For example, negligence claims require a case-by-case inquiry into the existence of a duty. In a constitutional claim, however, such a duty is established by the state constitution. Thus, in an ordinary negligence claim, "the reasonableness of the health care provider's actions can be evaluated by jurors on the basis of their common knowledge and experience," and, in a professional negligence claim, "the jury can only evaluate the plaintiff's claim after presentation of the standards of care by a medical expert." Szymborski v. Spring Mountain Treatment Ctr., 403 P.3d 1280, 1284-85 (Nev. 2017). Unlike either an ordinary or professional negligence claim, the legal obligation not to engage in cruel and unusual punishment does not have to be established by and arise out of a jury's evaluation of community or medical standards, but out of the Nevada Constitution. When a plaintiff brings a case alleging a constitutional violation, the court determines the existence of a duty as a constitutional matter,

1   rather than requiring the plaintiff to establish such a duty through medical expert testimony or

2   reliance on a jury's common knowledge or experience. More generally, while the contours of a

3   state tort claim, such as whether a duty has been breached, are typically resolved by juries, the

4   contours of a constitutionally provided protection are generally established by a court, as this is

5   the entity that is charged with interpreting constitutional rights. See Wisconsin v. Mitchell, 508

6   U.S. 476, 483 (1993); R.A.V. v. City of St. Paul, 505 U.S. 377, 381 (1992); Tom v. Sutton, 533

7   F.2d 1101, 1105-06 (9th Cir. 1976). Consequently, state tort claims fall short as alternatives to

8   state constitutional claims because they do not involve the unique constitutional duties and

9   protections that arise under the Nevada Constitution as interpreted and enforced by the courts.

10      Furthermore, the Nevada legislature has erected additional barriers to state tort claims that

11  are not applicable to state constitutional claims. For example, in order to bring a medical

12  malpractice claim, plaintiffs must provide an affidavit from a medical expert. See Limprasert v.

13  PAM Specialty Hosp. of Las Vegas LLC, 550 P.3d 825, 831 (Nev. 2024) ("The Legislature has

14  created a tightly scripted scheme for professional negligence actions in Nevada that limits recovery

15  for noneconomic damages, mandates settlement conferences, and more."). The failure to do so

16  leads to dismissal. Id. ("[T]he general rule under Nevada's statutory scheme is that any

17  professional negligence action filed without a supporting affidavit must be dismissed."). 

18  Additionally, Nevada caps punitive damages on tort claims, but no similar cap exists for claims of

19  deliberate indifference. For all these reasons, state tort claims are not a meaningful alternative

20  remedy for constitutional violations.

21      Finally, while Nevada has "waived sovereign immunity under some circumstances, it has

22  retained immunity for state officials exercising discretion." Carey v. Nevada Gaming Control Bd.,

23  279 F.3d 873, 878 (9th Cir. 2002) (citing Ortega v. Reyna, 953 P.2d 18, 23 (Nev. 1998)). This

24  discretionary immunity "precludes claims against state officers based on acts or omissions relating

25  to a 'discretionary function,' even if that discretion is abused." Jones v. Las Vegas Metro. Police

26  Dep't, 873 F.3d 1123, 1133 (9th Cir. 2017). However, "the Legislature has not provided for a state-

27  law equivalent of qualified immunity in the manner it exists under federal law[.]" Mack, 522 P.3d

28  at 451. Therefore, while a Plaintiff forced to rely on a negligence, or other state tort, claim would

face the hurdle of discretionary immunity, there would be no such barrier to their state constitutional claim. Finding negligence an adequate alternative to a state constitutional claim risks undermining the state's public policy that "state actors should generally take responsibility when they commit wrongs." Id. (internal citation omitted). The Nevada Supreme Court has specifically held that qualified immunity "is not a defense available to state actors sued for violations of the individual rights enumerated in Nevada's Constitution." Id. Forcing Plaintiffs to rely on a negligence claim, where immunity remains a defense, would circumvent the state court's finding in denying immunity for state constitutional claims.

Further, the test to establish whether state actors are entitled to discretionary-function immunity requires a consideration of whether their decision "(1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy." Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154, 1168 (9th Cir. 2014) (cleaned up) (quoting Martinez v. Maruszczak, 168 P.3d 720, 729 (Nev. 2007)). Yet, a constitutional violation is not measured against social, economic, or political policies. State tort claims, which allow such considerations, are once again not an adequate alternative to a constitutional claim. See, e.g., Brown v. State, 674 N.E.2d 1129, 1140 (N.Y. 1996) ("Common-law tort rules are heavily influenced by overriding concerns of adjusting losses and allocating risks, matters that have little relevance when constitutional rights are at stake.").

While the Nevada Supreme Court primarily considered the existence of alternative remedies in their analysis, none of the other Restatement factors disfavor recognizing a private right of action. Mack, 522 P.3d at 448; see also Katzberg, 58 P.3d at 357. Rights of action for Section 6 would not interfere with existing remedies and enforcement, nor would it burden the judiciary. Courts will evaluate claims under this right of action using the same well-developed standards they regularly apply for alleged Eight Amendment violations. See e.g., Wolf v. Nevada ex rel. Nevada Dep't of Corr., No. 3:22-cv-00308-MMD-CSD, 2024 WL 2051623, at *6 (D. Nev. Feb. 23, 2024), report and recommendation adopted, 2024 WL 1406554 (D. Nev. Apr. 1, 2024) ("[C]ourts within this district have applied the same legal standard to Article 1, Section 6 of the Nevada Constitution as are applied to the Eighth Amendment, and have allowed such claims to

1   proceed in federal court."); Meeks v. Nevada Dep't of Corr., 3:18-cv-00431-MMD-WGC, 2020

2   WL 8084979, at *19 (D. Nev. Nov. 10, 2020), report and recommendation adopted, 2021 WL

3   53619 (D. Nev. Jan. 6, 2021) ("Courts within this district have applied the same legal standards to

4   the cruel and unusual punishment corollary included in Article 1, Section 6. . . as are applied to

5   the corollaries in the United States Constitution, and have allowed such claims to proceed.");

6   Vickers v. Godecki, No. 2:20-cv-01401-GMN-NJK, 2023 WL 2435110, at *2 (D. Nev. Mar. 8,

7   2023) ("[The] Court applies the same legal standards to the cruel and unusual punishment

8   provision in Article 1, Section 6 of the Nevada Constitution as it does to the cruel and unusual

9   punishment provision of the Eighth Amendment of the U.S. Constitution."). As this analysis favors

10  a damages action to vindicate deliberate indifference rights under the Nevada Constitution, this

11  Court moves to the third part of the test.

12          The Nevada Supreme Court identified deference to legislative judgment, avoidance of

13  adverse policy consequences, considerations of government fiscal policy, practical issues of proof,

14  and the competence of courts to assess particular types of damages as the relevant special factors

15  to consider in recognizing a damages action. Mack, 522 P.3d at 449. First, the Court finds no

16  legislative judgments regarding a damages action for constitutional violations exists to which to

17  accord deference. Id. Second, a private right of action for money damages would not impose new

18  limitations on government conduct, given the developed status of deliberate indifference

19  jurisprudence. Id. Third, a private right of action for damages would impact legislative fiscal policy

20  if plaintiffs succeed in their suits against state actors. Fourth, a damages action for retrospective

21  harm presents no practical issues of proof different from other typical cases managed by the

22  judiciary. Id. Fifth, the court is equipped to assess damages in this case. Damages simply do not

23  represent a revolutionary or remarkable remedy, but, instead, remain a traditional remedy for

24  legally recognized wrongs. Id. (internal quotation marks omitted). Hence, the overwhelming force

25  of the special factors support identification of a private right of action.

26          Accordingly, considering the results of the Nevada Supreme Court's three-part test, this

27  Court finds that there is a state constitutional claim for deliberate indifference under Nevada law

28  and will allow Plaintiff's state cause of action to proceed beyond this stage.

### C. Adequacy of the Complaint

Next, the Defendants argue that, even if the Court does find that Plaintiff's Nevada constitutional claim is cognizable, Plaintiff has failed to adequately allege that Defendants were deliberately indifferent to her serious medical need. Thus, both the Nevada and federal constitutional claims should be dismissed. Specifically, Defendants argue that Plaintiff has failed to show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the Defendants chose this course in conscious disregard of an excessive risk to her health. The Court again disagrees.

#### i. *Legal Standard*

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Estelle, 429 U.S. at 102. A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of a prisoner. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (overruled on other grounds). To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted).

To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide

1    medical care." Id. (internal quotations omitted). This requires that the prison official "knows of

2    and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

3    from which the inference could be drawn that a substantial risk of serious harm exists, and he must

4    also draw the inference." Farmer, 511 U.S. at 837; see also Peralta v. Dillard, 744 F.3d 1076, 1086

5    (9th Cir. 2016).

6        A mere difference of medical opinion cannot support a claim of deliberate medical

7    indifference. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). Instead, a plaintiff must

8    show "that the chosen course of treatment was medically unacceptable under the circumstances,

9    and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." Id. (internal

10   quotation marks and citations omitted) (alteration in original). When a prisoner claims deliberate

11   indifference based on a delay in providing medical treatment, they must show that the delay led to

12   further harm. See Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

13   1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of

14   deliberate medical indifference"). Prison officials who know of a substantial risk to a prisoner's

15   health and safety are liable only if they responded unreasonably to the risk, even if the harm

16   ultimately was not averted. Farmer, 511 U.S. at 844.

17       The standard for deliberate indifference is "less stringent in cases involving a prisoner's

18   medical needs . . . because the State's responsibility to provide inmates with medical care

19   ordinarily does not conflict with competing administrative concerns." Snow, 681 F.3d at 985

20   (internal quotations omitted). Thus, in deciding whether there has been deliberate indifference,

21   courts "need not defer to the judgment of prison doctors or administrators." Id. at 985 (internal

22   quotations omitted).

23                                    *ii.  Discussion*

24       The Court finds that the allegations in the Complaint are sufficient to state a state and

25   federal claim for deliberate indifference against the Defendants Omandac, Weigert, Nehls, and

26   Hopkins.[2]

27   _____

28       [2] The Court does not find that Plaintiff has alleged sufficient facts to state a claim for deliberate indifference

1      The Court first reiterates its finding pursuant to <u>Mack</u> that the state and federal claims for

2  deliberate indifference overlap in terms of their jurisprudence and standards.

3      There is no dispute that the Defendants in this case were acting under color of state law or

4  that Plaintiff's rotator cuff tear, which caused her substantial pain and rendered her unable to lift

5  her arm for ten months, is an objectively serious medical need. <u>See</u> <u>Colwell v. Bannister</u>, 763 F.3d

6  1060, 1066 (9th Cir. 2014) ("Indications that a plaintiff has a serious medical need include '[t]he

7  existence of an injury that a reasonable doctor or patient would find important and worthy of

8  comment or treatment; the presence of a medical condition that significantly affects an individual's

9  daily activities; or the existence of chronic and substantial pain.'").

10      The named Defendants were also deliberately indifferent under the subjective prong of the

11  deliberate indifference test. The Complaint plausibly alleges that Omandac, Nehls, Weigert, and

12  Hopkins (a) were aware of Plaintiff's continuing and unmitigated pain and ignored it, and (b)

13  disregarded her underlying injury to a degree that posed an excessive risk to her health.

14      Plaintiff notified Omandac about her injury eleven days after it occurred on May 21, 2021.

15  Plaintiff told Omandac that she could not lift her arm and remained in substantial and continuing

16  shoulder pain as a result of the fall. Instead of conducting any further diagnostics or scheduling

17  Plaintiff for a follow-up appointment, Omandac simply told Plaintiff that she had pulled a muscle.

18  A week later, almost 20 days after the injury, Plaintiff notified Omandac again, through a medical

19  kite, that her shoulder remained in continuing and substantial pain and that she still could not lift

20  her arm. Although at this time, Omandac claimed to have put Plaintiff on a waiting list to see a

21  doctor, she summarily classified Plaintiff's request as a non-emergency and warned her that she

22  would be disciplined for sending any future medical kites. Yet, Plaintiff suggests that Omandac

23  did not actually place her on a list, given the extreme delay in her treatment. After aggravating her

24  injury at JCC, Plaintiff saw Omandac again in November 2021, four months after her original

25  shoulder injury. Omandac noted Plaintiff's original injury, which had not been treated with

26

27  against Defendant Leifert. The only allegation against Leifert is that she received and ignored a kite from Plaintiff regarding her misclassification, which had been preventing Plaintiff from transferring to JCC. This kite did not put Leifert on notice of Plaintiff's injury, nor did the kite contain a request for medical treatment. Therefore, Plaintiff does

28  not plausibly allege that Leifert acted in conscious disregard of an excessive risk to Plaintiff's health and the Court will dismiss Leifert without prejudice.

anything other than ineffective pain killers, and ordered x-rays, but did nothing to address Plaintiff's ongoing and unmitigated pain. Moreover, it took another four months and four follow-ups from Plaintiff before she finally had these x-rays taken. Plaintiff never saw the results of these x-rays nor received any further treatment for her shoulder until she was released.

Along with Defendant Omandac, Plaintiff also saw Defendant Wiegert in November 2021. At this time, the pain and severity of Plaintiff's shoulder injury was evident to both Omandac and Weigert. Plaintiff had been experiencing the same consistent pain for nearly six months, had severe swelling, and a significantly limited range of motion. Despite being on notice of these facts and despite receiving a medical kite from Plaintiff a month later, which indicated that no x-rays had been taken, Weigert did not take any action. Weigert's inaction was not, as Defendants characterize it, a simple "delay" between medical appointments; her inaction effectively prevented Plaintiff from receiving any medical care at all. Thus, Weigert also ignored Plaintiff's ongoing and unmitigated pain.

The same is true for Defendants Nehls and Hopkins. When Plaintiff was transferred to the work unit at FWMCC on August 30, 2021, three months after her injury, she told Defendant Hopkins about her pain, including that she could not lift her left arm or perform basic tasks such as dressing. She also told Hopkins that she was still waiting for an appointment with NDOC medical. Hopkins took no action and Plaintiff remained in the work unit until October 5, 2021, before being transferred to another work unit at JCC. This continued work, which she felt compelled to do, aggravated and exacerbated Plaintiff's injury.

Upon her arrival to JCC, Plaintiff informed Defendant Nehls about her shoulder injury and the substantial chronic pain she had been experiencing for the past five months. Despite Nehl's knowledge of her painful, and unresolved injury, Nehls wrote down that there were "no findings for continuing care" and that "no follow-up" was required. Although Nehls ordered several pain relief medications for Plaintiff, including Icy-Hot and Tylenol, he was aware, from her prior history, that such medications did not address her pain. Moreover, his decision to designate Plaintiff as requiring no follow-up, even though she had been in continuing pain for five months, represents a medically unacceptable denial of treatment or diagnosis of her underlying condition.

Finally, there are ample allegations that the delay in medical care created an excessive risk of substantial harm to Plaintiff as well as the exacerbation of her pain. Had either Omandac or Nehls responded appropriately to Plaintiff's symptoms of continued, substantial pain and immobility, Plaintiff would have been diagnosed with a rotator cuff tear and would have received the appropriate treatment to address both her injury and pain. Instead, Plaintiff was transferred to a work unit at FMWCC on August 30, 2021, where she remained until October 5, 2021. Then, she was transferred to JCC, where she was assigned to a work unit once again. She was forced to carry a 45-pound pack for three miles. This aggravated her shoulder injury to such a degree that Plaintiff almost fainted from the pain, her arm was swollen from her shoulder to her hand, and her ability to move her arm significantly hindered. After ten months of substantial pain, immobility, and swelling, Plaintiff left the prison to learn that she had a rotator cuff tear that required surgery. Therefore, the Defendants' motion to dismiss for failure to state a claim for deliberate indifference under the federal and state constitutions is denied.

### D. Qualified Immunity

In their final argument, Defendants assert that they are entitled to qualified immunity on the federal claim. The Court disagrees.

#### i.  *Legal Standard*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability, and it "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, (1) whether the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id.

Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (brackets in original omitted). "This requires two

separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City & Cnty. of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (brackets in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. Further, the right must be defined at "the appropriate level of generality . . . [and the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also Ashcroft, 563 U.S. at 741-42.

### iii.  Discussion

For the reasons stated above, the Court has already found that Plaintiff has sufficiently alleged that Defendants Omandac, Weigert, Hopkins, and Nehls violated Plaintiff's Eighth Amendment constitutional right to be free from cruel and unusual punishment, therefore meeting the first prong of the test. As to the second prong, Defendants assert that "there is no published Ninth Circuit decision that would have alerted Defendants that their treatment efforts were so medically unacceptable, and done in such disregard for Plaintiff's health, that it constituted a constitutional violation." The Court disagrees.

At the time of the events in question, 2021 through 2022, it was well established that prison staff who purposefully ignored or failed to respond to a prisoner's known serious injury and repeated requests for treatment constituted deliberate indifference to that injury. Jett v. Prenner, 439 F.3d 1091, 1098 (9th Cir. 2006) (holding that failing to address a prisoner's pain and offer appropriate treatment establishes deliberate indifference). That was the case even when the "defendants provided medical care, medications, and specialist referrals." See Snow, 681 F.3d at 986 (finding that delay, denial, and interference in providing hip surgery for two years constitutes

1  deliberate indifference despite the fact that plaintiff was seen by several healthcare providers
2  throughout the period). Plaintiff has plausibly alleged, as noted previously, that various Defendants
3  failed to take steps within their respective authority to allow Plaintiff to seek and receive treatment
4  for her injury and that their respective responses were "medically unacceptable." Such conduct
5  was clearly established as unconstitutional. See Hamby v. Hammond, 821 F.3d 1085, 1092 (9th
6  Cir. 2016) (internal citations omitted).

7      Additionally, it was also well established by 2021 that the failure to address, or
8  disregarding a prisoner's ongoing acute pain, was unconstitutional. See Peralta, 744 F.3d at 1086.
9  Plaintiff has also plausibly alleged that all of the Defendants disregarded her chronic acute pain.

10      Finally, it was also well established by 2021 that forcing a prisoner to engage in actions
11  that would exacerbate an injury or pain was unconstitutional. See Hamilton v. Endell, 981 F.2d
12  1062, 1067 (9th Cir. 1992) (overruled in part on other grounds) (finding that forcing plaintiff to
13  get on a flight with an injured ear after being on notice that ear injury would worsen from flight
14  constitutes deliberate indifference). Plaintiff has sufficiently alleged that the Defendants
15  exacerbated her injury, including by forcing her to perform the three-mile run or to use the top
16  bunk.

17      The Court rejects Defendants' attempt to establish a justification for their actions at this
18  juncture. Defendants claim that any delay in medical care "was because of inmate demand and
19  security concerns like lockdown." First, this alleged justification has not been (and cannot be)
20  established at this stage of the case. Second, Defendants' argument does not explain their alleged
21  failure to acknowledge Plaintiff's injury or ignore her chronic pain. Defendants have not presented
22  any authority for the proposition that they can simply ignore ongoing pain and injury for months
23  for unspecified "administrative challenges." Therefore, the Defendants' motion to dismiss for
24  qualified immunity is denied.

25          **E.  Motion to Stay**

26      The Court is vested with broad discretion to manage discovery. Dichter-Mad Fam.
27  Partners, LLP v. United States, 709 F.3d 749, 751 (9th Cir. 2013) (per curiam); Surfvivor Media,
28  Inc. v. Survivor Prods., 406 F.3d 625, 635 (9th Cir. 2005); Hallett v. Morgan, 296 F.3d 732, 751

(9th Cir. 2002). A stay of discovery pending resolution of potentially dispositive issues furthers the goal of efficiency for the courts and the litigants. <u>Little v. City of Seattle</u>, 863 F.2d 681, 685 (9th Cir. 1988) (stay of discovery pending resolution of immunity issue). Having now resolved the dispositive issues, the Court finds that a stay is no longer warranted. Accordingly, Defendant's motion to stay is denied.

### F.  Motions for Leave to File Document

Defendants also filed two motions for leave to file a document. Defendants wish to file two trial court orders, <u>Michael Hutchinson et al. v. Eric Ramirez et al.</u>, A-23-874494-C, from the Eighth Judicial District Court, and <u>Richard Denson et al. v. State of Nevada ex rel. Nevada Department of Corrections et al.</u>, A-23-883014-C, from the Eighth Judicial District Court. Both of these orders found that <u>Mack v. Williams</u> precluded the finding of a private right of action for damages under Article I, Section 6.

The Local Rules require the parties to obtain leave of the Court before filing any supplemental briefs. L-R 7-2(g). The Court may grant leave to file supplemental authority "for good cause" found. <u>Id.</u> "Good cause may exist either when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." <u>Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP</u>, 526 F. Supp. 3d 805, 812 (D. Nev. Mar. 17, 2021). The Court denies the motion. <u>Hutchinson</u> and <u>Denson</u> are state trial court opinions, and therefore the Court finds that they are neither controlling nor particularly persuasive.

### VI.    CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss, (ECF No. 4), is **DENIED**.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Stay, (ECF No. 42), is **DENIED**. A Proposed Joint Pretrial Order is due by **6/19/2025**.

**IT IS FURTHER ORDERED** that the Defendants' Motions for Leave to File Document, (ECF Nos. 27, 45), are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Leifert is dismissed without prejudice.

- 23 -

1      **IT IS FURTHER ORDERED** that the Motion for a Settlement Conference, (ECF No.

2  48), is **GRANTED**. The parties shall reach out to the assigned Magistrate Judge to set up a date

3  for a conference.

4

5  **DATED:** March 31, 2025.

6  _____

7      **RICHARD F. BOULWARE, II**

    **UNITED STATES DISTRICT JUDGE**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28